IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTOPHER M. REAVES,                          No. 3:17-cv-00494-HZ

        Plaintiff,

   v.

NEXSTAR BROADCASTING, INC., a                   OPINION & ORDER
Delaware corporation, and LIN
TELEVISION CORPORATION dba
KOIN-TV, a Delaware corporation,

        Defendants.

Gene Mechanic
MECHANIC LAW FIRM
65 S.W. Yamhill Street, Suite 200
Portland, Oregon 97204

Whitney Stark
ALBIES & STARK
210 S.W. Morrison Street, Suite 400
Portland, Oregon 97204

     Attorneys for Plaintiff

/ / /

Thomas P. Busch
MacCOLL BUSCH SATO, P.C.
10260 S.W. Greenburg Road, Suite 600
Portland, Oregon 97223

Charles W. Pautsch
Lisa A. Baiocchi
PAUTSCH, SPOGNARDI & BAIOCCHI LEGAL GROUP LLP
233 South Wacker Drive, Suite 2200
Chicago, IL 60606

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Christopher Reaves brings this employment discrimination and tort action against his former employer Lin Television Corporation (LIN-TV) as well as Nexstar Broadcasting, Inc. (Nexstar), a company that LIN-TV merged with after the events in this case occurred. Defendants move for summary judgment on the merits of all of Plaintiff's claims. Plaintiff moves for partial summary judgment on the single issue of Nexstar's successor liability for the acts committed by LIN-TV. I grant Defendants' motion as to the retaliation claims which Plaintiff withdraws, grant the motion on the "interactive process claims" to the extent they are asserted as stand-alone claims, grant the motion on the intentional interference with emotional distress claim, and deny the motion on all other claims. I grant Plaintiff's motion.

BACKGROUND

      At the relevant time, LIN-TV owned local television station KOIN-TV in Portland. KOIN hired Plaintiff as an assignment editor in its news department in April 2012. Stark May 14, 2018 Decl., Ex. 4, ECF 45 at 2. He was terminated in October 2015.[1] *Id.*, Ex. 28, ECF 45 at

---

      [1] Plaintiff is a member of the National Association of Broadcast Employees & Technicians which grieved his dismissal and took it to arbitration. On December 7, 2016, an

2 - OPINION & ORDER

41-42. According to an undated job announcement for the position, an assignment editor "facilitates producers' needs for the stations [sic] newscasts[;] [and] [g]enerates story ideas, researches, assigns, and directs crews and provides for follow up as needed." Busch Apr. 23, 2018 Decl., Ex. 1, ECF 34-1 at 4. Assignment editors must be able to work various shifts and possess "[s]olid news judgment as well as strong logistical skills," the "ability to work well in a fast paced and intense environment," and the ability "to multi-task and prioritize[.]" *Id.* Additionally, according to Casey Wenger, Nexstar's Human Resources and Business Administrator at KOIN, assignment editors "are responsible for establishing a network of contacts and constantly interact with numerous organizations throughout the community on a daily basis to gather information, including various local and state police departments." Wenger Apr. 20, 2018 Decl. ¶ 3, ECF 34-2. "As such," Wenger states, "it is an essential part of the job to have a good working relationship with these organizations, especially the police departments." *Id.* Plaintiff initially worked as a weekend assignment editor as well as a helper three days during the week. Stark May 14, 2018 Decl., Ex. 1, ECF 43-1 (Arbitration Hearing Transcript at 54) (hereinafter "Arb. Trans.").[2] Plaintiff moved to weekday mornings and then was moved back to the weekend assignment editor position. *Id.*

---

arbitrator determined KOIN did not establish, by clear and convincing evidence, that it had just cause to terminate Plaintiff under the operative collective bargaining agreement. Stark May 14, 2018 Decl., Ex. 29; ECF 43-1 at 397-428. Plaintiff was reinstated to his position as a result of the arbitrator's decision. *Id.*

[2] Defendants made no objection in their summary judgment briefing to Plaintiff's submission of arbitration hearing testimony. However, at oral argument on the motions, Defendants asked for the opportunity to brief the issue of whether the arbitrator's findings were binding on this Court. My citation to any arbitration hearing testimony is only to provide background facts. Because I do not rely on the arbitrator's findings for any other purpose, briefing on this issue is unnecessary.

I. Work History From Hire to September 1, 2015

Plaintiff's last performance appraisal at KOIN before his October 2015 termination is dated November 2, 2013. Plaintiff met expectations in eighteen categories and exceeded expectations in two categories. Stark May 14, 2018 Decl., Ex. 6, ECF 45 at 3-6. He was not rated as below expectations or unsatisfactory in any category. *Id.* Plaintiff was never placed on a performance improvement plan. Arb. Trans. at 312 (Pl. Test.). Generally, he received both positive and critical feedback about his work. *Id.* at 312-14 . KOIN's News Director Kate Glover, however, described Plaintiff's work as showing a "progressive pattern of unprofessional behavior that was getting worse as time went by despite corrective measures." *Id.* at 54. She described his performance as "very inconsistent." *Id.*

The summary judgment record shows that in 2014 and 2015, Plaintiff received several written warnings for unacceptable conduct. *E.g.*, Wenger Apr. 20, 2018 Decl., Ex. A (Oct. 29, 2014 written warning regarding unprofessional communication); *id.*, Ex. B (Nov. 17, 2014 written warning designated as "final" regarding an inappropriate "reply all" email to the Vancouver Police Department and noting that Plaintiff's conduct was reckless and could cause long lasting and far reaching issues for KOIN as a news organization); *id.,* Ex. C (Feb. 27, 2015 "Final Warning with Suspension" for improperly using his status and association with KOIN to influence a personal matter at a restaurant); *id.*, Ex. E (Aug. 7, 2015 "Written Warning" addressing inappropriate email regarding a coworker).

There is also evidence of other employees complaining about Plaintiff's conduct. *Id.*, Ex. D (June 18, 2015 email from Jason Stevens to Glover and Wenger complaining about statement Plaintiff made in a group); Busch Apr. 23, 2015 Decl., Ex 5 (June 27, 2015 email from lead

assignment editor Colin Miner to Glover and Stevens, stating that "Christopher's negatives are far outweighing his usefulness on the desk" and complaining about problems with Plaintiff's work and personality).

II.  Disability-Related Knowledge by Defendants/Leave Requests Before September 1, 2015

    A.  Disabilities

Plaintiff has been diagnosed with depression, alcoholism, bipolar disorder, generalized anxiety, and post-traumatic stress disorder (PTSD).  Stark May 14, 2018 Decl., Ex. 5 (Pl. Depo.) 123:22-124:5, ECF 43-1 at 359-360.  At his arbitration hearing, he testified that in June or July 2012, just a few months after he was hired, he told then-Assistant News Director Jason Kravarik and lead assignment editor Tamara Greenville about his mental health issues because he wanted them to know he was having problems with depression and suicidal thoughts in case he might need time off.  Arb. Trans. 316:24-317:19.

After the October 2014 written warning, Plaintiff told Glover that he had been diagnosed with depression, anxiety, and PTSD.  *Id.*, 323:16-324:3-5.  Glover asked him if the PTSD was related to military service, to which Plaintiff answered no and explained that it was the result of childhood abuse and trauma.  *Id.*, 324:3-8.  Then, in December 2014, Carrie Biggs-Adams, Plaintiff's union representative, had a conversation with Cheryl Robb, LIN-TV's labor relations professional, about Plaintiff's mental health conditions.  *Id.*, 414:7-415:21.  Biggs-Adams emailed Robb a treatment summary from Plaintiff's treating therapist stating that he was being treated for major depressive disorder, mild, single episode; generalized anxiety disorder; and PTSD.  *Id.*; Stark May 14, 2018 Decl., Ex. 11, ECF 45 at 12 (copy of email to Robb with therapist's treatment summary).

B.  Leave Requests

Sometime in the "spring of 2015," Plaintiff disclosed to Glover and Miner that he was an alcoholic and needed to go to inpatient treatment for help.  Arb. Trans. 326:10-13; 327:8-13.  Plaintiff initiated the meeting.  *Id.*  He believed his depression was worsening and his alcohol consumption outside of work was very high.  *Id.*, 326:15-23.  He was concerned about himself and his health.  *Id.*  Glover responded that she had no idea Plaintiff had an alcohol problem.  *Id.*, 328:1-3.

At the time, Plaintiff was working Monday through Friday, 4 am to 12 pm.  *Id.*, 328:10-11.  He took medical leave from May 4, 2015 to May 17, 2015.  Stark May 14, 2018 Decl., Ex. 12.  He was treated at Cedar Hills Hospital and diagnosed with alcohol dependence, history of marijuana dependence versus abuse, and PTSD.  *Id.* at 4.  On May 15, 2015, Liisa Heard, Plaintiff's therapist at Cedar Hills, notified KOIN that Plaintiff was ready to return to work on May 18, 2018.  *Id.*, Ex. 13.  The letter informed KOIN that Plaintiff had been receiving treatment at Cedar Hills's Outpatient Services since May 11, 2015, and that Heard recommended he return to work on May 18, 2015.  *Id.*  She also recommended that Plaintiff continue his participation in the Impaired Professionals Program at Cedar Hills Outpatient for the duration of the eight-week program.  *Id.*  She referred to Plaintiff's commitment to outpatient treatment and his active participation in the program.  *Id.*  His completion date was set for July 6, 2015, after which he would be encouraged to attend the ongoing "Continuing Care" support group.  *Id.*

Upon return from leave on May 18, 2018, Plaintiff worked his Monday - Friday, 4 am to 12 pm schedule.  At some point, Plaintiff was told his shift would be changed.  According to Plaintiff's arbitration hearing testimony, Miner told him his shift was going back to Wednesday

through Sunday, with split hours. Arb. Trans. 329:2-8. Plaintiff states that he was displeased and wanted to remain on his current shift. *Id.* at 329:10-12. He was disappointed because KOIN was giving his old shift to a new hire and "this was her, her first job and I'd been doing this for awhile." *Id.* at 329:12-16. Plaintiff stated that Miner explained that placing Plaintiff back on weekends would let Plaintiff keep his "head down" and "out of Kate's [Glover's] sights." *Id.* at 329:17-19.

Plaintiff discussed the planned change with Heard. *Id.* at 330:2-4. On June 24, 2015, Heard sent a letter via email to Wenger, as well as to union representatives Biggs-Adams and Kevin Wilson. Stark May 14, 2018 Decl., Ex. 14. Heard wrote that during group and individual counseling sessions, Plaintiff had disclosed experiencing increasing anxiety after receiving news that his shift was changing back to weekends. *Id.* She wrote that Plaintiff reported that his current weekday, early-morning shift was "conducive to his early recovery, allowing him to regularly attend AA meetings, participate in group, and re-engage with his family." *Id.* Heard recommended that Plaintiff's weekday schedule stay the same for at least three months. *Id.* She explained that "during early remission, it is important that support systems established are maintained and if his shift changes this could potentially undermine his progress thus far." *Id.*

Glover and Wenger then met with Plaintiff on June 30, 2015. Reaves Decl. ¶ 2, ECF 42. In his Declaration, Plaintiff states that Glover was hostile as evidenced by her facial expressions and raised voice. *Id.* ¶ 3. Plaintiff believes that Glover "refused to accept the recommendation of my therapist." *Id.* He told Glover that the schedule change would prevent him from spending time with his wife and children on the weekends when they were available. *Id.* He told her further that the split shift hours would prevent him from getting sufficient sleep. *Id.*

7 - OPINION & ORDER

Nonetheless, Glover told Plaintiff she would change his schedule effective on or about July 6, 2015. *Id.*

In a June 30, 2015 memorialization of the meeting, written by Wenger six days after the meeting, Wenger states that he and Glover told Plaintiff that they had received Heard's letter and wanted to make sure to accommodate Plaintiff's needs for all of his appointments. Busch Apr. 23, 2018 Decl., Ex. 6, ECF 34-1. Wenger confirmed with Plaintiff that he would still be able to make his appointments with his new schedule. *Id.* Wenger and Glover discussed the reason for the schedule change and why they believed it would relieve Plaintiff's stress and be good for him. *Id.* Wenger noted that Plaintiff had been making a lot of errors and mistakes which could not be tolerated and that he told Plaintiff he had to cut down on the errors and mistakes. *Id.*

Glover then attempted to describe some error that Plaintiff had recently made. *Id.* Plaintiff tried to defend himself and Glover "got very vocal and loud." *Id.* She explained she was frustrated, that she wanted him to succeed, and she was not seeing "that success." *Id.* Wenger wrote that Glover was again "very loud and almost yelling at [Plaintiff] while explaining her view." *Id.* She scolded Plaintiff and yelled at him about a particular incident. *Id.* Plaintiff tried to explain but she would not listen. *Id.* At that point, Wenger cut it off and explained it was not going to be resolved "like this." *Id.* He told Plaintiff to "take this new opportunity and show us what you can do." *Id.* They believed this new schedule would be less stressful for Plaintiff. *Id.* At that point, Plaintiff walked out. *Id.*

Wenger wrote that later that day, Plaintiff came to Wenger's office and they talked for about an hour. *Id.* Plaintiff expressed frustration and believed Glover was trying to terminate him. *Id.* He believed that despite his trying hard, he was never good enough to please Glover.

*Id.* After further discussion about the dynamic of the relationship between Plaintiff and Glover, Wenger told Plaintiff that Glover was the news director and the final say was hers. *Id.* Wenger wrote that Plaintiff said "he was only given a two week chance to work the morning shift and now [Glover] was going with the new college girl." *Id.* Plaintiff told Wenger that the switch in mid-week from day to mornings was tough and he was unable to sleep. This is where some of his alcohol problems started because he was using it to make him sleepy or black out. *Id.*

In his Declaration, Wenger states that he and Glover agreed to make sure that Plaintiff was scheduled so that he would have time to participate in his group therapy and to attend AA meetings. Wenger Decl. ¶ 10. They told him that he would not be given a weekday/early morning schedule. *Id.* According to Wenger, at no time in this meeting or at any point, did Plaintiff suggest that he could not do his job on the weekday/weekend shift. *Id.*

III. Events of September 1, 2015 to Termination

A. The September 1, 2015 Incident

Plaintiff relapsed and began drinking again. On September 1, 2015, he was depressed, intoxicated, had an argument with his wife, and walked out of his house with the intention of being hit by a car. Arb. Trans. 334:1-25. He went to a relatively busy road, lay down, and closed his eyes. *Id.* That is the last thing he remembers until he woke up the next morning in a holding cell in the Multnomah County jail. *Id.* When Plaintiff left his house, Plaintiff's wife called 911, stating that Plaintiff had left the house on foot and was threatening to hurt himself. Stark Decl., Ex. 17 (M. Reaves Depo.) 110:5-21.

Police found Plaintiff lying in Shattuck Road, near Beaverton-Hillsdale Highway. Busch Apr. 23, 2018 Decl., Ex. 2 (police reports). Plaintiff was surrounded by vehicles which had

stopped, apparently to protect him. *Id.* The police made sure Plaintiff was breathing, and talked to those present to confirm he had not been hit by a car. *Id.* When the second officer arrived, they blocked off Shattuck Road. *Id.* Before emergency medical services arrived, Plaintiff kept trying to sit up and leave. *Id.* Once he was checked by emergency medical services, which confirmed he was uninjured, Plaintiff was told he needed to stand up and get out of the street. *Id.* He responded with "Fuck you." *Id.* He repeated this to the police who then "assisted" Plaintiff to his feet by lifting him up by his upper arms. *Id.* He was then placed into custody. *Id.* The police described him as belligerent, cursing at them, and kicking as they tried to put a seat belt on him. *Id.* After arriving at the jail, he lay down on the ground and refused to get up. *Id.* Jail deputies then assisted him and took him inside where he continued to be noncompliant and failed to listen to simple commands. *Id.*

When Plaintiff woke up in the jail the next morning, September 2, 2015, he was booked for disorderly conduct. Later he was transported to Providence Portland Medical Center where he was placed on a mental hold. Arb. Trans. 335:12-21; *see also* Stark May 14, 2018 Decl., Ex.20 (emergency department chart note). He was discharged later that day, after being seen by a social worker and a psychiatrist. *Id.* at 2337:22-338:3. According to Plaintiff, he was released into the care of his wife. *Id.* He later learned that the disorderly conduct charge had been dismissed. Stark May 14, 2018 Decl., Ex. 19.

When Plaintiff did not show up at work as scheduled on September 2, 2015, assistant news director Jason Stevens called Plaintiff's wife who told Stevens Plaintiff was not well. Arb. Trans. 223:12-224-13. Stevens passed the information to Glover. *Id.* at 224:12-13. Glover called Plaintiff's wife. *Id.* at 91:7-19. Glover was concerned about whether Plaintiff was going

to come to work the following day and asked Plaintiff's wife if Plaintiff could call Glover back by 6:00 to 6:45 pm. *Id.*

Plaintiff called Glover about 6:30 pm. *Id.* at 336:9-337:21. He almost immediately started sobbing uncontrollably. *Id.* He told her he was in the hospital and tried to kill himself when he was drunk and got into an argument with his wife. *Id.* He related that his wife was concerned, had called 911, that the police came and took him into custody, and eventually he was taken to a hospital. *Id.* He testified that in response, Glover told him to take care of himself and to let her know what was happening. *Id.* He told her he would not be at work the next day but would call her and let her know when he was ready to return. *Id.* After talking to Plaintiff, Glover emailed Wenger and others to update them about Plaintiff including telling them he had tried to commit suicide and was in the hospital on a mental hold. Stark May 14, 2018 Decl, Ex. 18.

B. Medical Leave

Plaintiff checked himself into Cedar Hills Hospital on September 5, 2015. Stark May 14, 2018 Decl., Ex. 36. He remained there until September 14, 2015. *Id.* Upon discharge, his diagnoses were PTSD; major depressive disorder, recurrent; anxiety disorder not otherwise specified; alcohol dependence continuous; and alcohol withdrawal. *Id.*

The day before, on September 4, 2015, he requested medical leave from KOIN for September 2, 2015 through September 15, 2015. Wenger Decl. ¶ 16. He requested and received additional medical leave through October 13, 2015. *Id.* On October 14, 2015, Plaintiff presented a release from his physician, stating that he was ready to return to full, active, and regular work duties. Stark May 14, 2018 Decl., Ex. 27.

11 - OPINION & ORDER

C.  Termination

After speaking with Plaintiff on September 2, 2015, Glover asked the assignment desk to see if there was information in the court system about the September 1, 2015 incident.  Arb. Trans. 98:1-8.  An assignment editor found the charging document and a mug shot.  *Id.*  Glover also called the Portland Police Bureau's Public Information Officer.  *Id.* at 98:16-18, 101:4-5.  In an email on September 3, 2015 sent to Wenger and others, Glover summarized what had been learned from the police and concluded by saying that Plaintiff had lied to her.  Stark May 14, 2018 Decl., Ex. 22.  She stated: "he never said he was arrested or was in jail or had a mug shot taken."  *Id.*

Wenger states that because of the nature of Plaintiff's position and the importance of his relationship with police departments, KOIN believed it was necessary to investigate the incident further.  Wenger Decl. ¶ 14.  It was also important to get Plaintiff's side of the story.  *Id.*  On September 4, 2015, Glover and Wenger talked to Plaintiff by phone.  *Id.* ¶ 15; Arb. Trans. 244:8, 343:24-25-344:1-2.  In notes that appear to have been made soon after that phone call, Wenger wrote that the station had heard about Plaintiff's arrest and because of the incident, KOIN was going to perform an investigation "to find out what is going on."  Stark May 14, 2018 Decl., Ex. 23.  Wenger told Plaintiff that Plaintiff was not to come to work until he was notified to return. *Id.*  His access to the office was being removed until the investigation was complete and his emails would be forwarded to a manager so that the station would miss no client calls or information.  *Id.*  Wenger asked Plaintiff why he had not informed them of "his situation" and asked if he wanted to tell them what was going on.  *Id.*  Plaintiff shared that he had had a fight with his wife, had gone into the street to try and get run over, his wife called 911, the police came

and took him to jail where he was charged with disorderly conduct and booked into jail, that he was released with charges dropped and the case dismissed, and that he had been taken to Providence Hospital for a mental health/suicide evaluation. *Id.* In his Declaration, Wenger states that KOIN asked Plaintiff why he had not mentioned his arrest previously, to which Plaintiff stated that he had not said anything because the charges were dropped. Wenger Decl. ¶ 15. Wenger states that Plaintiff was placed on administrative leave while the station completed its investigation. *Id.*

On September 11, 2015, Wenger emailed Plaintiff a letter stating that the station had completed its investigation into the events "of last week," including his September 1, 2015 arrest. Stark Decl., Ex. 25. Wenger told Plaintiff that before making any determination about what, if any, disciplinary actions may be appropriate, the station wanted to meet with Plaintiff and his union representative to allow Plaintiff to explain his actions. *Id.* Wenger told Plaintiff that the meeting would not take place until after Plaintiff had completed his leave and been cleared by his health care provider to return to work. *Id.*

Plaintiff was cleared to work on October 13, 2015. Wenger Decl. ¶ 17. KOIN scheduled a meeting with Plaintiff on October 14, 2015 to obtain information from Plaintiff. *Id.* ¶ 19. Leading up to this meeting, Wenger prepared a chronological time table of what he calls the "key events" in Plaintiff's recent employment history, including disciplinary events and leave periods. *Id.* ¶ 18; *Id.*, Ex. F. On October 14, 2015, station managers, including Wenger, met with Plaintiff in person. *Id.* ¶ 19. He was asked why he had not been forthcoming about the details of his arrest. *Id.* Plaintiff responded that he did not mention it because the charges were dropped and he could not remember the details of that night. *Id.* Plaintiff was asked if he understood that his

actions impacted his credibility and undermined KOIN's trust in him.  *Id.* ¶ 20.  He said yes and agreed that it was especially important to be able to trust someone in his position which required him to have a good relationship with various police organizations.  *Id.*  He also agreed that his actions, even those outside of work, could impact the station's relationship in the community, including the police agencies and their impression of the station.  *Id.*

At the start of the meeting, at which Plaintiff, Wenger, and Glover attended in person with union representative Adam-Biggs on the phone, Plaintiff presented his release to return to work from his psychiatrist, Dr. Gilbert Simas, who said that Plaintiff had been followed by his clinic, would continue to engage in its services, and was ready to return to work.  Stark Decl., Ex. 27.  Apparently, Plaintiff waited until the day before the October 14, 2015 meeting to request the letter from his doctor.  Arb. Trans. 352:8:18.  During a regular session with Dr. Simas on October 13, 2015, Dr. Simas told Plaintiff that his assistant would email Plaintiff the letter clearing him for work.  *Id.*  He also told Plaintiff that he was going to be out of town for two weeks and Plaintiff would not be able to see him.  *Id.*  By closing time of Dr. Simas's office, Plaintiff had not yet received the letter.  *Id.* at 352:19-20.  Plaintiff knew the letter was important because Glover had told him he could not return to the building without it.  *Id.* at 352:20-24.  Plaintiff accessed his work LexisNexis account from his home computer to look up an email address for Dr. Simas.  *Id.* at 353:4-8.  After finding some gmail addresses, Plaintiff emailed Dr. Simas to request that he ask his assistant to send the letter.  *Id.* at 353:9-15.  He received the letter the next morning.  *Id.*

During the October 14, 2015 meeting, Glover asked Plaintiff about the use of his work LexisNexis account.  *Id.* at 355:6-20.  Plaintiff explained why he had accessed the account.  *Id.*

Glover told Plaintiff that his access to LexisNexis had been cut off as a result of the September 4, 2015 call (presumably referring to the administrative leave).

As Wenger explains in his Declaration, afer the October 14, 2015 meeting with Plaintiff, the station reviewed all of the information gathered during its investigation, considered the information provided by Plaintiff, and reviewed Plaintiff's disciplinary history. Wenger Decl. ¶ 21. Wenger states that KOIN decided to terminate Plaintiff effective October 16, 2015 because his actions demonstrated a failure to meet acceptable work conduct and performance standards and evidenced his inability to effectively perform his job then and in the future. *Id.* ¶ 22. The actions cited included his intoxication on September 1st, his failure to be "upfront" with the station following the incident (by not disclosing the arrest presumably), and by accessing the company's LexisNexis account while on leave. *Id.* Wenger states that Plaintiff's acts showed that he had "completely disregarded the final warnings" he had been given. *Id.* A formal termination letter, dated October 16, 2015, summarized prior incidents, noted the September 1, 2015 disorderly conduct arrest, remarked on his failure to be "upfront" with KOIN, and discussed his access to the LexisNexis account. Wenger Decl., Ex. G. The letter concluded that as a result of Plaintiff's actions and in light of his previous warnings, he was terminated effective that date. *Id.*

IV. Relationship Between Defendants

KOIN has been a TV station in Oregon since 1953 and is a local CBS affiliate. Arb. Tr. 27:18-19, 28:9-11. LIN Media bought the station from New Vision Television in October 2012. *Id.* at 236:8-11. Media General, Inc. acquired LIN Media in 2014. Wenger May 14, 2018 Decl. ¶ 3 (before the merger of Media General, Inc. with Nexstar in January 2017, LIN operated as a

subsidiary of Media General and had done so since December 2014).

Media General and Nexstar officially merged in January 2017. *Id.* (referring to merger of Media General, Inc. v. Nexstar Broadcasting, Inc.). Defendants confirmed at oral argument that there is no dispute that as part of the merger, Nexstar, through its acquisition of Media General, acquired all of LIN-TV's properties, rights, privileges, powers as well as all of its claims, obligations, liabilities, and debts. *See* Stark May 14, 2018 Decl., Ex. 2 at 12 (Merger Agreement). The merger, finalized on January 17, 2017, resulted in Nexstar owning KOIN. *Id.*, Ex. 3 at 6-8 (SEC filing by Nexstar Media Group, Inc. stating that on January 17, 2017, it completed its merger with Media General, Inc.); *id.*, Ex. 32 at 3, 29 (Federal Communications Commission Order transferring the control applications (call signs and community of license) of KOIN and other Media General television stations to Nexstar Media Group, stating that "the acquisition of Media General by Nexstar through a series of mergers" would mean that all "of the Media General license subsidiaries will be direct or indirect wholly owned subsidiaries of Nexstar and will hold all the same broadcast licenses they currently do"). On April 29, 2017, Nexstar filed a "Voluntary Statement of Foreign Merger" with the Oregon Corporation Division stating the Name of Surviving Entity as Nexstar Broadcasting, Inc. and the Name of Non-Surviving Entity as LIN Television Corporation. *Id.*, Ex. 33. The Oregon Secretary of State's website notes the Nexstar "Action" as "Articles of Merger" and lists Nexstar Broadcasting, Inc. as the "Merger Survivor" and LIN Television Corporation as the "Merger Non Survivor." *Id.*

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

DISCUSSION

Plaintiff brings the following claims:

(1) a claim under the federal Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213

(ADA), alleging that Defendants terminated him because of his disabilities (Claim One), and an analogous claim under Oregon's disability discrimination statutes, Oregon Revised Statute § (O.R.S.) 659A.103-659A.145, and in particular O.R.S. 659A.112 (Claim Five);

(2) an ADA claim that Defendants failed to engage in the interactive process regarding a reasonable accommodation for his disabilities (Claim Two), and an analogous Oregon statutory claim (Claim Six);

(3) an ADA claim that Defendants failed to provide a reasonable accommodation for his disabilities (Claim Three), and an analogous Oregon statutory claim (Claim Seven);

(4) an ADA claim alleging that Defendants' discipline and termination of Plaintiff was in retaliation for Plaintiff having reported his disabilities and having sought accommodation of his disabilities (Claim Four), and an analogous Oregon statutory claim under Oregon's disability discrimination statutes, O.R.S. 659A.109, as well as Oregon's more general whistleblower statute, O.R.S. 659A.199 (Claim Eight) (which specifically alleges that Defendants' February 2017 suspension, August 2015 written warning, and October 2015 termination were in retaliation for Plaintiff "raising" his disabilities and seeking accommodation);

(5) a claim under Oregon's Family Leave Act, O.R.S. 659A.150-659A.196 (OFLA), as well as a claim under Oregon's more general whistleblower statute, alleging that Defendants discriminated and retaliated against him because he requested and took family medical leave (Claim Nine); and

(6) an intentional infliction of emotional distress (IIED) claim (Claim Ten).

As indicated above, Plaintiff withdraws the retaliation claims.

/ / /

I.  Disability Discrimination Claims

Defendants move for summary judgment on Plaintiff's disability discrimination claims. Defendants discuss the federal and state claims together because relevant law provides that the state statute is to be construed "to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act[.]"  O.R.S. 659A.139; *see also Atwood v. PCC Structurals, Inc.*, No. 3:14-cv-00021-HZ, 2015 WL 3606323, at *10 (D. Or. June 4, 2015) (applying "the same analysis for Plaintiff's federal and state law disability discrimination claims" in light of O.R.S. 659A.139).

A.  Unlawful Termination Claims

Defendants argue that Plaintiff cannot establish a prima facie case that he was terminated or disciplined as a result of his disabilities because he cannot show that at the time of his 2015 discharge he was a qualified individual with a disability or that he suffered an adverse employment action *because of* his disability.  "To prevail on an ADA claim of unlawful discharge, the plaintiff must establish a prima facie case by showing that: (1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability."  *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001).  It is the plaintiff's burden to establish these elements.  *See, e.g.*, *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013) (indicating the plaintiff must show a prima facie case); *James v. James River Paper Co.*, No. CV 94-142-ST, 1995 WL 938383, at *5 (D. Or. Apr. 6, 1995) ("Plaintiff bears the burden of showing a *prima facie* discrimination under the ADA"), *aff'd*, 101 F.3d 705 (9th Cir. 1996).

Defendants do not contest the first element that Plaintiff is a disabled person.  Defendants'

arguments focus on the second and third elements of the prima facie case.

        1.   Qualified Individual with a Disability

Both federal and state statutes contain similar "qualified individual" provisions. Under the ADA, "[t]he term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Under Oregon law, an "individual is qualified for a position if the individual, with or without reasonable accommodation, can perform the essential functions of the position." O.R.S. 659A.115.

Defendants argue that because Plaintiff cannot handle stress and interact appropriately with others, he cannot perform the essential functions of his job. Defendants rely on cases which address whether employees who commit acts of misconduct may still be terminated even though such misconduct is related to or arises out of a disability. The cases are either factually distinct or otherwise not on point.

The primary relevant case is *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941 (9th Cir. 2015). There, the Ninth Circuit addressed whether the plaintiff had established a prima facie case of discrimination under the ADA, and particularly, the second element of whether he was a qualified individual with a disability. *Id.* at 944 (assuming the plaintiff was disabled, and then discussing whether he was qualified at the time of his discharge). The plaintiff in *Mayo* had major depressive disorder and successfully worked for the defendant for many years. *Id.* at 942. At some point, however, the plaintiff and some coworkers took issue with a supervisor which led to meeting with the defendant's human resources director. *Id.* Shortly thereafter, the plaintiff made threatening comments to at least three coworkers, including stating that he felt like coming

to the workplace with a shotgun and "blowing off" the heads of the supervisor and another manager. *Id.* The plaintiff made other comments to coworkers on several occasions that he wanted to bring a gun and shoot people at the workplace and made a specific comment about the time in the afternoon when the supervisor would be doing a "walk-through." *Id.* The coworkers reported the comments to management. The senior human resources manager talked to the plaintiff who said he "couldn't guarantee" he would not "do that," referring to his threats to shoot the supervisor. *Id.* at 942-43. The defendant suspended the plaintiff, barred him from company property, and notified the police. *Id.* at 943. A police officer visited the plaintiff at his home that evening. *Id.* The plaintiff admitted to making the threats and stated that he had "two or three people in mind, including the supervisor." *Id.* He admitted to owning several guns, although he had not decided which gun to use. *Id.* When the police asked him if he planned to go to the workplace and "start shooting people," the plaintiff responded: "Not tonight." *Id.* Later, after taking leave and undergoing psychological treatment, the plaintiff requested to return to work. *Id.* The defendant terminated him.

The Ninth Circuit affirmed Judge King's conclusion that the plaintiff could not meet his burden to show he was a qualified individual given his violent threats. *Id.* The court explained:

> An essential function of almost every job is the ability to appropriately handle stress and interact with others. *See Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002). And while an employee can be qualified despite adverse reactions to stress, he is not qualified when that stress leads him to threaten to kill his co-workers in chilling detail and on multiple occasions (here, at least five times). This vastly disproportionate reaction demonstrated that Mayo could not perform an "essential function" of his job, and was not a "qualified individual." This is true regardless of whether Mayo's threats stemmed from his major depressive disorder. *Cf. Newland v. Dalton*, 81 F.3d 904, 906 (9th Cir. 1996) ("Attempting to fire a weapon at individuals is the kind of egregious and criminal conduct which employees are responsible for regardless of any disability.").

*Id.* at 944.

The court cited to decisions from other circuits which had similarly concluded that threats to the safety of others make an employee not "qualified" within the meaning of the ADA. *Id.* at 944-45. Summarizing those decisions, the Ninth Circuit stated: "We agree with our sister circuits. An employee whose stress leads to serious and credible threats to kill his co-workers is not qualified to work for the employer, regardless of why he makes those threats." *Id.* (footnote omitted). The court rejected the plaintiff's argument that a more individualized assessment of a "direct threat" was required. *Id.* at 945. The court also rejected the plaintiff's argument that the cases cited by the court involved more "extreme facts" and thus, the facts presented were distinguishable. *Id.* at 945-46.

Finally, the court concluded that its ruling was consistent with those cases holding that "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Id.* at 946 (internal quotation marks omitted). The court discussed three cases, none of which were decided at the prima facie case stage. *Id.* at 946-47. In one, the court had held that the employee was in fact a qualified individual at the prima facie case stage because a reasonable accommodation in the form of a leave of absence or working from home could have addressed the "misconduct" of not regularly showing up for her job which the plaintiff attributed to her obsessive-compulsive disorder. *Id.* (discussing *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128 (9th Cir. 2001)). In another, the court explained that the employer had argued that the employee was unable to operate heavy machinery due to the employee's uncontrolled epilepsy, but did not argue that his failure to be more forthcoming rendered him unqualified. *Id.* (discussing *Dark v. Curry Cty.*, 451 F.3d 1078 (9th Cir. 2006)). The *Dark* court

disagreed with the employer's argument because the road department could have accommodated him through reassignment or a period of leave. *Id.* Finally, as to the third case, the employee had a temper tantrum when she received a negative review. *Id.* (discussing *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087 (9th Cir. 2007)). The *Gambini* court held that the employee's violent outburst was protected if it stemmed from her bipolar disorder, but, the *Mayo* court explained, the *Gambini* court had specifically noted in response to a petition for rehearing that the employer was free to argue that she was not a qualified individual which it had not previously done. *Id.*

Plaintiff here made no violent threats, or any kind of threat, to anyone at the workplace or while at the workplace. There is no evidence that he ever made a threat of violence to any supervisor or coworkers. While there is evidence indicating he may have lost his temper or yelled at work, Busch Apr. 23, 2018 Decl., Ex. 5 (Miner June 27, 2015 email to Glover and Stevens), nothing in the record supports an inference that he was violent or threatening at work or toward his professional colleagues.

Defendants argue that Plaintiff's conduct on September 1, 2015 was threatening because he put others in danger when he lay down in the road. Defendants also suggest that Plaintiff threatened police officers. Defendants' arguments are not supported by the facts when those facts are taken in a light most favorable to Plaintiff which they must be when analyzing Defendants' summary judgment motion. First, it is clear that even under Defendants' contentions, Plaintiff's September 1, 2015 conduct did not actually threaten any of his coworkers. Plaintiff's actions occurred while he was at home, not at work, and involved only his family, other drivers on Shattuck Road, and the police. While Plaintiff conceded to KOIN that his conduct that night was capable of tarnishing KOIN's image, no reasonable juror could conclude that his conduct was

actually threatening to any coworkers or supervisors.  Second, when viewed in Plaintiff's favor, the evidence supports an inference that while he created a traffic inconvenience, he caused no harm.  Plaintiff's wife testified that "neighbors heard him and moved their cars so that nobody would run over him."  M. Reaves Dep. 110:19-21.  The police report notes one witness who saw Plaintiff "stagger out of the trail head" at Southwest Shattuck and 53rd, stumble into the street, and fall down.  Busch Apr. 23, 2018 Decl., Ex. 2 at 4.  The witness stopped immediately.  *Id.* And, by the time police arrived, several cars had stopped in the road.  *Id.*  Other cars approaching turned around upon realizing they could not drive through.  *Id.*  When these facts are viewed in a light most favorable to Plaintiff, a reasonable juror could conclude that Plaintiff's conduct was not threatening to anyone but himself.

As to the police reports, they show that Plaintiff was belligerent and disorderly with the police when arrested.  *Id.* at 1-5.  But there is no evidence that he actually threatened the police officers or attempted to hurt them.  The record does not suggest that the police were in fear of Plaintiff or believed he jeopardized their safety.

Moreover, as Plaintiff notes in his response to the summary judgment motion, he was not fired for making threats.  He was fired for off-duty conduct of getting arrested which Defendants assert subjected the station to embarrassment and public ridicule, not being forthcoming about having been arrested, and using his LexisNexis account to obtain Dr. Simas's email address. Putting aside issues of fact as to whether his use of the LexisNexis account was to benefit him personally or his employer and whether the fact of his behavior on September 1, 2015 actually caused embarrassment to the station, Plaintiff was not in fact terminated for being unable to handle stress, inappropriate interactions with coworkers, or making any threats or engaging in

any other misconduct at work.

Defendants' argument also overlooks *Mayo's* limited holding. While *Mayo* noted that an "essential function of almost every job is the ability to appropriately handle stress and interact with others," the court did not hold that every employee who has difficulty handling stress cannot, as a matter of law, establish a prima facie case of disability discrimination. The court made clear that its holding was that threatening "to kill co-workers in chilling detail and on multiple occasions" revealed a "vastly disproportionate reaction" to stress on the job which, as a matter of law, precluded the plaintiff from performing the job's essential functions. *Mayo*, 795 F.3d at 944; *see also id.* at 945 ("Mayo's credible, detailed, and unwavering plan to kill his supervisors more than adequately demonstrated that he lacked the ability to appropriately handle stress and interact with others"). The court, addressing the narrowness of its holding, expressly wrote that "[w]e emphasize that we only address the extreme facts before us in this case: an employee who makes serious and credible threats of violence toward his co-workers." *Id.* at 945 n.4. Contrary to Defendants' assertion, absent a credible threat of violence to a coworker or supervisor, facts showing that an employee may have adverse reactions to stress are not enough to conclude, as a matter of law, that the employee cannot perform the essential functions of the job. The facts here are distinct from those in *Mayo*.

Additionally, the other cases cited by Defendants are distinguishable. In *Newland v. Dalton*, 81 F.3d 904 (9th Cir. 1996), the plaintiff was arrested after he attempted to fire an assault rifle at individuals in a bar. At the time, he was a civilian employee of the Navy which discharged him for "notoriously disgraceful conduct" as a result of the incident. *Id.* at 905. He alleged that his termination violated the Rehabilitation Act based on his argument that his

alcoholism caused his "drunken rampage." *Id.* The district court dismissed the claim, concluding that the plaintiff failed to state a claim. The Ninth Circuit affirmed. The court held that although alcoholism is a recognized handicap, it did not immunize the plaintiff from the consequences of this "drunken rampage." *Id.* at 906. While the statute protects employees from being fired solely because of their disability, employees are still responsible for conduct which would otherwise result in their termination. *Id.* The court explained that firings precipitated by misconduct rather than handicap do not violate the Act. *Id.* According to the Ninth Circuit opinion, the plaintiff recognized that he was terminated for his misconduct. *Id.* The termination occurred not in retribution for his alcoholism but in response to his attempt to fire an assault rifle inside a bar. *Id.* (further noting that "[a]ttempting to fire a weapon at individuals is the kind of egregious and criminal conduct which employees are responsible for regardless of any disability").

*Newland* does not make clear whether its holding was made in the context of a prima facie "qualified individual" analysis or at a later step in the analysis of motive and pretext. Regardless, the case is distinguishable because it either resolved a pretext/motive issue that does not address the initial prima facie element of "qualified individual" or, it involves facts like *Mayo* of egregious and criminal conduct that as a matter of law establish the inability to perform the essential functions of the job.

*Newland* relied on *Collings v. Longview Fibre Co.*, 63 F.3d 828 (9th Cir. 1995), where the employees violated drug-free workplace conduct rules. The employees admitted buying, selling, or using marijuana at work or returning to work under its influence. After they were terminated, they argued that they were disabled under the ADA, that they were qualified

individuals with a disability, and that they were discriminated against because of their drug addiction disability. *Id.* at 832. The court assumed, without deciding, "that the plaintiffs had such a disability[.]" *Id.* But, it explained, the ADA specifically provides that employers have the right to prohibit drug-related misconduct at the workplace. *Id.* (citing 42 U.S.C. § 12114(c)). The statute also addresses the use of alcohol at the workplace and in addition, expressly states that an employer may hold an employee who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the employee's alcoholism. 42 U.S.C. § 12114(c)(4). The Ninth Circuit noted the distinction between termination of employment because of misconduct and termination of employment because of a disability. *Id.* It concluded that given the plaintiffs' concession that they used, purchased, and sold drugs on company property, the employer was entitled to act "as it did in discharging them because their misconduct, rather than any alleged disability, was the reason for their discharge." *Id.* at 833. And, the court added, the ADA specifically states that individuals currently engaging in the illegal use of drugs are not protected.

*Collings*, like *Newland*, does not offer a crisp analysis. Although it does note that the plaintiffs argued that they were qualified individuals with a disability under § 12114(b), the court then assumed without deciding, that the plaintiffs "had such a disability." *Id.* at 832. The decision is unclear if the court was referring generally to the asserted drug addiction disability or to the phrase "qualified individuals with a disability." Later, the court noted that the employees were discharged because of their misconduct not because of their disability, suggesting that the analysis was one of pretext/motive, not one assessing whether the employees were "qualified

individuals with a disability."  Regardless, the ADA's distinct treatment of illegal drug use, use of drugs or alcohol in the workplace, or unsatisfactory performance attributable to drug use or alcoholism, indicates that misconduct related to these disabilities is not judged under the same standard as misconduct related to other mental health disorders.

Plaintiff's undisputed diagnoses include PTSD and depression.  This alone distinguishes the *Newland* and *Collings* cases.  As *Humphrey*, a case discussed in *Mayo*, explained,

> [t]he text of the ADA authorizes discharges for misconduct or inadequate performance that may be caused by a "disability" in only one category of cases-alcoholism and illegal drug use: "[An employer] may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee." 42 U.S.C. § 12114(c)(4). In line with this provision, we have applied a distinction between disability-caused conduct and disability itself as a cause for termination only in cases involving illegal drug use or alcoholism. *See Newland v. Dalton*, 81 F.3d 904, 906 (9th Cir.1996) (holding that an employer may fire an employee who went on a "drunken rampage" and attempted to fire an assault rifle at individuals in a bar); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 (9th Cir.), *cert. denied*, 516 U.S. 1048, 116 S.Ct. 711, 133 L.Ed.2d 666 (1996) (employees discharged for drug-related misconduct at the workplace); *see also Hartog*, 129 F.3d at 1085–88 (reviewing cases in all circuits and finding that "the disability vs. disability-caused conduct dichotomy seems to be unique to alcoholism and drugs."). In *Newland*, however, we suggested that an additional exception might apply in the case of "egregious and criminal conduct" regardless of whether the disability is alcohol- or drug-related. *See Newland*, 81 F.3d at 906 ("Attempting to fire a weapon at individuals is the kind of egregious and criminal conduct which employees are responsible for regardless of any disability.").

*Humphrey*, 239 F.3d at 1139 n.18.  The drug use/alcoholism exception was inapplicable to the absences and tardiness in *Humphrey* because the plaintiff's disability was obsessive compulsive disorder.  *Id.*  In fact, the court expressly stated that for purposes of the ADA, other than these notable exceptions, "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for disability."  *Id.* at 1139-40.

Because Plaintiff has multiple mental health diagnoses and it is arguable that his depression and not his alcoholism caused his conduct of September 1, 2015, *Newland* and *Collings* are not instructive. And, because Plaintiff's conduct was not threatening to others as a matter of law, *Mayo* and *Newland* are distinguishable.

### 2. Terminated Because of Disability

The third element of the three-element prima facie case is whether Plaintiff was terminated because of his disability. Defendants argue that this requires the application of a "but for" test, but the case Defendants cite is a *retaliation* case, not a discrimination case. After *Gross v. FBL Financial Services*, 557 U.S. 167 (2009), which applied a but-for standard in Age Discrimination in Employment (ADEA) claims, it appears to be undecided in the Ninth Circuit whether the "motivating factor" test from Title VII or the "but for" ADEA test applies to ADA discrimination claims. In a 2013 case, Judge Simon held that the motivating factor standard applied to ADA discrimination claims. *Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 977 F. Supp. 2d 1058, 1062-63 (D. Or. 2013) (discussing statutory text and legislative history and concluding that absent a "clear indication" that *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013) which held that the "but for" standard applied to retaliation claims under Title VII, should be extended to ADA discrimination claims, he would "follow existing Ninth Circuit precedent" and apply the "motivating factor" standard to ADA discrimination claims). For the reasons explained by Judge Simon, I follow his conclusion.

Defendants argue that Plaintiff engaged in aggravating and threatening acts of misconduct the night of September 1, 2015 in his "threatening and out of control bout of extreme public intoxication on Shattuck Road." Defs.' Mot. 18. Defendants cite to Plaintiff's "lack of candor"

during the subsequent investigation done by KOIN into the incident and his violation of company policy precluding employees from using company resources, such as LexisNexis, for any use not solely to benefit the company. Defendants contend that Plaintiff used the LexisNexis program for his own benefit to obtain his own release to work, making his use primarily for personal purposes. Defendants argue that Plaintiff cannot show that his mental health conditions "caused" his termination. Instead, he was terminated due to his repeated violations of work performance and conduct standards, including, Defendants state, multiple events involving insults directed toward the police, who serve as an important source of information for LIN-TV. *Id.* Defendants assert that there are no facts indicating that Plaintiff's termination was due to his depression, anxiety, or PTSD. Instead, Defendants argue, "[d]ue to the undisputed fact that he was highly intoxicated during the September 1, 2015, public misconduct incident[,] his alcoholic disorder is inevitably drawn into the analysis." *Id.* As a result, Defendants argue, he cannot satisfy the third prong of his prima facie case.[3]

I reject Defendants' argument. There are issues of fact as to whether the reasons given by Defendants in support of termination are related to Plaintiff's mental health diagnoses. Defendants wrote that Plaintiff was terminated because he was arrested for disorderly conduct which was unprofessional and subjected the station to embarrassment and public ridicule. Yet,

---

[3] In one conclusory paragraph, Defendants then set forth the rest of the burden-shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), by stating that if the court determines that Plaintiff has established a prima facie case, the same result would be obtained under *McDonnell Douglas* because Plaintiff has no direct or indirect evidence of discriminatory intent. Defs.' Mot. 20. I do not discuss this argument because it is not fully developed, no standards are cited, and in any event, for the reasons I conclude that there are issues of fact on the third element of the prima facie case, there are issues of fact regarding the intent/pretext element of the burden-shitting analysis.

Plaintiff was not convicted of any crime or shown to have violated a law. Second, Plaintiff's attempt to kill himself by drinking and walking into the road are arguably attributable to his depression. Moreover, Plaintiff testified that the stress resulting from the schedule change away from the Monday-Friday schedule urged by his counselor, contributed to his suicide attempt. *Humphrey* recognized that a "link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability" that results in a discharge for performance problems arising from that disability. 239 F.3d at 1140.

As to his failure to tell KOIN that he had been arrested, KOIN did not directly ask Plaintiff this question. It is arguable that his failure to disclose the details of the September 1, 2015 incident when he spoke to Glover while still in the hospital on a psychiatric hold, is attributable to his mental health diagnoses. Moreover, there is certainly an argument that accessing the LexisNexis account was for the employer's benefit. Although Defendants argue that Plaintiff's use of the account was for his own benefit, there is no policy in writing regarding the use of the account and employees are permitted to use the program for employment-related matters. Arb. Trans. 280:12-281:9. Based on these facts, it is arguable that Plaintiff's use did not violate company policy. If so, this undermines the reason articulated by Defendants which then provides a reasonable basis for arguing that Defendants' reason(s) for termination are pretextual. Additionally, in attempting to provide evidence of his fitness to return to work from his medical doctor, Plaintiff's conduct in accessing the account was related to his mental health disabilities.

Plaintiff needs little evidence to establish a prima facie case. *Rogers v. Or. Trail Elec. Consumers Co-op., Inc.,* No. 3:10-cv-1337-AC, 2012 WL 1635127, at *22 (D. Or. May 8, 2012) ("The proof required at the prima facie stage for employment discrimination cases 'is minimal

and does not even need to rise to the level of a preponderance of evidence.") (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994); citing *Kinney v. Emmis Operation Co.*, 291 F. App'x 789, 790 (9th Cir. 2007)).  All inferences must be construed in his favor.  When the evidence is viewed as such, there are material issues of fact regarding the basis for his termination.

I deny Defendants' motion on the disability-discrimination unlawful termination claims.

B.  Interactive Process and Reasonable Accommodation Claims

Plaintiff brings separate claims under Oregon and federal law for failure to engage in the interactive process.  Defendants move for summary judgment on those claims based on decisions from this Court holding that there is no independent claim of failure to engage in the interactive process separate from the failure to provide a reasonable accommodation claim.  *E.g.*, *Randle v. Tri-Cty. Metro. Transp. Dist. of Or.*, 171 F. Supp. 3d 1084, 1089 (D. Or. 2016) ("Engaging in the interactive process is not an independent cause of action under the ADA, rather it is part of an employer's duty to accommodate") (citing *Dean v. Safeway, Inc.*, No. 3:12-cv-01875-PK, 2014 WL 6473543, *16–17 (D. Or. Nov. 18, 2014); *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 292 (7th Cir. 2015)).  I grant summary judgment to Defendants on these claims to the extent Plaintiff attempts to state them as independent "failure to engage" claims.  The facts, however, are still relevant to the failure to reasonable accommodate claims.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability . . . ."  42 U.S.C. § 12112(a); *see also* O.R.S. 659A.112(1) (unlawful employment practice for employer to discriminate on basis of disability).  The term "discriminate" includes

not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b)(5)(A); *see also* O.R.S. 659A.112(2)(e) (same).

To determine what the appropriate reasonable accommodation should be, the "legislative history makes clear that employers are required to engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations." *Barnett v. U.S. Air*, 228 F.3d 1105, 1111 (9th Cir. 2000), *vacated on other grounds*, 535 U.S. 391 (2002). The regulations envision "an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

Generally, the interactive process "is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." *Barnett*, 228 F.3d at 1112. As explained in *Humphrey*, the "interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process" and "[e]mployers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Humphrey*, 239 F.3d at 1137-38. The ADA and its implementing regulations specifically provide that reasonable accommodations include modified work schedules. 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2)(ii). The Oregon statutes contain similar protections. O.R.S. 659A.118(1)(b).

Plaintiff argues that Defendants failed to provide the reasonable accommodation he requested in June 2015 to keep his Monday-Friday schedule, which was supported by his therapist. Plaintiff states that although KOIN met with him to discuss his request, its response did not include a "good faith exploration of possible accommodations." According to Plaintiff, Glover was hostile during the meeting and rejected his request. Wenger's notes of the meeting indicate that after discussing the schedule, Glover confronted Plaintiff about his recent errors and that she got very vocal and loud. He described her as almost yelling at Plaintiff.

Defendants characterize this meeting as an "interactive discussion," and argue that they ensured that Plaintiff's new work schedule would allow him time to participate in group therapy and attend his AA meetings. Defendants argue that if an employee is able to perform the essential functions of his or her job but requires a different schedule for personal reasons to make it easier to cope with a disability, this does not trigger a reasonable accommodation. *See Roloff v. SAP Am., Inc.*, 432 F. Supp. 2d 1111, 1120-22 (D. Or. 2006) (under 29 C.F.R. § 1630.2(o)(1)(ii), which defines reasonable accommodation to include "modifications or adjustments ... that enable a qualified individual with a disability to perform the essential functions of that position," the law requires an employer to provide reasonable accommodation to an employee to allow him or her to perform the essential functions of the job; because plaintiff conceded that he was able to perform those functions without reasonable accommodation, his reasonable accommodation claim failed).

Defendants argue that Plaintiff never asserted that he could not perform the essential functions of his job on another shift. Instead, "he just wanted a different shift to perform his work." Defs.' Mot. 22. With no citation to the record, Defendants assert that Plaintiff obtained

the note from his counselor because he believed he was going to be moved to a new shift due to performance issues. According to Defendants, Plaintiff never required accommodations to perform his essential duties. Alternatively, Defendants argue that even if KOIN was obligated to provide reasonable accommodations, it did so. It accommodated his schedule to attend therapy sessions and made sure he would be able to attend his appointments. It also allowed him to take leaves of absence as necessary. Defendants state that Plaintiff made no other accommodation suggestions.

Defendants do not mention that Plaintiff states he told Wenger and Glover that the schedule change would interfere with his sleep as well as prevent him from spending time with his wife and children on the weekends when they were available. When viewed in a light most favorable to Plaintiff, the information Plaintiff provided to Defendants was enough to imply he would be unable to perform the essential functions of his job without keeping the Monday - Friday schedule. Inadequate sleep would obviously interfere with his ability to perform his job. Time with his family was critical to his recovery and although the evidence is that Plaintiff had never been intoxicated at work, if his recovery were not sustained he could arguably be precluded from performing the essential functions of the job. As a case discussed in *Roloff* indicates, an employer may be obligated to provide an accommodation that may prevent a condition from worsening even though the employee could perform the essential functions of the job without the accommodation. *Branson v. West*, No. 97 C 3538, 1999 WL 311717, at *10-12 (N.D. Ill. May 11, 1999) (paraplegic employee whose use of a wheelchair was causing fatigue and other physical ailments requested reasonable accommodation of a service dog which would assist her performance of many activities including pulling her wheelchair, opening and closing doors,

holding doors open, and picking up dropped items) (discussed in *Roloff*, 432 F. Supp. 2d at 1121); *see also Roloff*, 432 F. Supp. 2d at 1122 (discussing *Nawrot v. CPC Int'l*, 259 F. Supp. 2d 716 (N.D. Ill. 2003) (court could not conclude as a matter of law on summary judgment that breaks were not a reasonable accommodation for a diabetic employee to perform the essential functions of his job when without them, the employee might collapse and be unable to perform the job at all, or when an accommodation is required "to live regardless of his essential job functions")). I agree with Plaintiff that the jury could reasonably infer that the failure to allow Plaintiff to maintain the Monday - Friday schedule for three more months, as requested by his therapist, led to a downward spiral. Based on the facts, a reasonable juror could conclude that maintaining the weekday shift was, in fact, required for Plaintiff to perform the essential functions of his job.

It is possible the evidence may show otherwise. There is also evidence that Plaintiff was upset about the schedule change because a new college graduate was given his weekday shift. Thus, it is possible to infer that his mental health diagnoses were not in fact the basis for his request to stay on the weekday schedule. But, when the evidence is construed in a light most favorable to Plaintiff, an argument can be made that (1) in response to the requested accommodation to stay on weekdays, KOIN met with Plaintiff but never intended to engage in an interactive discussion given Plaintiff's description of Glover's behavior during the meeting and Defendants' evidence that it believed the shift change was required because of Plaintiff's errors and performance problems, (2) KOIN failed to provide Plaintiff with his requested accommodation, and (3) the shift change was a causal factor in his relapse which is circumstantial evidence that staying on the weekday shift was in fact required for him to perform

the essential functions of his job.

I deny Defendants' motion on the reasonable accommodation claims.

## II. OFLA Claim

OFLA, like its federal counterpart the Family Medical Leave Act (FMLA), prohibits an employer from taking negative action against an employee who has requested leave. O.R.S. § 659A.183; 29 U.S.C. § 2615(a)(1) (making it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" the substantive rights guaranteed by FMLA). OFLA is to be construed "to the extent possible in a manner that is consistent with any similar provisions" under FMLA. O.R.S. 659A.186(2). Thus, Oregon courts look to federal law when interpreting OFLA. *Benz v. W. Linn Paper Co.*, 803 F. Supp. 2d 1231, 1250 (D. Or. 2011).

Claims brought pursuant to § 2615(a)(1) are known as "interference claims" under FMLA. *Bachelder v. Am. West Airlines, Inc.*, 259 F.3d 1112, 1122-25 (9th Cir. 2001). The Ninth Circuit does not apply the *McDonnell Douglas* burden-shifting framework to FMLA "interference" claims. leave. *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). Instead, Plaintiff must show, by a preponderance of circumstantial or direct evidence, only that he engaged in protected activity, was subject to negative consequences, and a causal link between the two. *Wilson v. Providence Health & Servs.*, No. 3:14-cv-01091-JE, 2015 WL 4366218, at *6 (D. Or. July 14, 2015) (citing *Bachelder*, 259 F.3d at 1125).

Defendants acknowledge that Plaintiff can establish the first two elements because he took leave and was terminated. But, Defendants assert that Plaintiff is "completely unable to come forward with any evidence, direct or indirect" showing that his OFLA leave played any part in any adverse action. Defs.' Mot. 28. Because the evidence, when examined in a light most

favorable to Plaintiff, creates an inference of causation, I disagree with Defendants.

The requisite causation can be inferred from the temporal proximity between the protected conduct and the adverse action. *See Webb v. Intel Corp.*, No. 3:17-cv-01089-SI, 2018 WL 1547354, at *5 (D. Or. Mar. 29, 2018) (rejecting the defendant's argument that the plaintiff could not establish a causal connection between the use of FMLA leave and termination because the plaintiff needed only circumstantial evidence of a connection and causation could be inferred by the proximity of time between the use of FMLA leave and termination). Here, Plaintiff took OFLA leave in May 2015 and in September - October 2015. He was terminated in mid-October 2015. This is close enough proximity to create an inference of causation. Moreover, when Wenger was preparing for the October 14, 2015 meeting with Plaintiff upon his return from leave, Wenger prepared a chronological time table of what he calls the "key events" in Plaintiff's recent employment history, including disciplinary events and leave periods. Wenger Decl., ¶ 18; *Id.*, Ex. F. While Wenger may be able to offer a legitimate, nondiscriminatory reason why he included leave periods in this list, the inclusion of the leave periods raises an inference of causation. I deny Defendants' motion on the OFLA claim.

IV. IIED Claim

To establish an IIED claim under Oregon law, Plaintiff must show that Defendants intended to inflict severe emotional distress, that Defendants' acts were the cause of Plaintiff's severe emotional distress, and that Defendants' acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. *McGanty v. Staudenraus,* 321 Or. 532, 563, 901 P.2d 841, 849 (1995). As to the third element, conduct that is merely "rude, boorish, tyrannical, churlish, and mean" does not support an IIED claim. *Patton v. J.C. Penney Co.*, 301 Or. 117,

124, 719 P.2d 854, 858 (1986).  "[T]he tort does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life even when the intentional conduct causing plaintiff's distress otherwise qualifies for liability."  *Hall v. The May Dep't Stores Co.*, 292 Or. 131, 135, 637 P.2d 126, 129 (1981).  Whether the alleged conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law for the court.  *Harris v. Pameco Corp.*, 170 Or. App. 164, 171, 12 P.3d 524, 529 (2000).

In a 2008 case, the Oregon Court of Appeals explained that the "classification of conduct as 'extreme and outrageous' depends on both the character and degree of the conduct."  *House v. Hicks*, 218 Or. App. 348, 358, 179 P.3d 730, 736 (2008).  The conduct must be "'regarded as atrocious, and utterly intolerable in a civilized community'."  *Id.* (quoting Restatement (Second) of Torts § 46, comment d).  The court considers "whether the offensiveness of the conduct exceeds any reasonable limit of social toleration, which is a judgment of social standards rather than of specific occurrences."  *Id.* at 358-59, 179 P.3d at 736.

"The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior."  *Madani v. Kendall Ford, Inc.*, 312 Or. 198, 204, 818 P.2d 930, 934 (1991) (no claim where employee terminated for refusing to pull down pants).  "In the employment context . . . a wrongful discharge from employment by itself [is] not the type of conduct that would support an IIED claim."  *House*, 218 Or. App. at 366, 179 P.3d at 740; *see also Watte v. Maeyens*, 112 Or. App. 234, 237, 828 P.2d 479, 480-81 (1992) (no claim where employer threw a tantrum, screaming and yelling at his employees, accused them of being liars and saboteurs, then fired them all).

Defendants argue that the act of termination cannot support Plaintiff's IIED claim because it is not itself an extraordinary transgression of the bounds of socially tolerable conduct. Plaintiff argues that his claim is supported by KOIN's "callous, outrageous, and disingenuous behavior" and its "remarkable indifference" to Plaintiff's mental health. Pl.'s Opp. at 28, 29. Plaintiff points to (1) Glover's "fabricating" a false claim that Plaintiff lied by failing to disclose his September 1, 2015 arrest when she had full knowledge of Plaintiff's precarious mental state, and (2) her denial of his request for reasonable accommodation by yelling at him during the meeting at which the request was discussed. Plaintiff contends that a reasonable factfinder could consider Glover's conduct as intending to cause him emotional distress. He also contends that the facts establish conduct which transgresses the bounds of socially tolerable conduct.

I disagree. Even assuming that Glover's termination of Plaintiff was wrongfully motivated, mean, and carried out with such similar intent, the facts, even when considered in a light most favorable to Plaintiff, do not establish the level of "extreme or outrageous" conduct sufficient to sustain the claim. *E.g.*, *Madani*, 312 Or. at 204, 818 P.2d at 930 ("An employer's *motive* for the act is not relevant to whether the *act* transgressed the bounds of socially tolerable conduct; the act itself must be intolerable"). And, even if the conduct did meet the required standard, the evidence cannot be reasonably construed to show that Glover actually *intended* to cause Plaintiff severe emotional distress. Accordingly, I grant Defendants' motion on the IIED claim.

V. Punitive Damages Claim

Plaintiff seeks punitive damages on his state and federal disability claims. Defendants move for summary judgment on all punitive damages claims, arguing that under either the state

or federal standard, Plaintiff has failed to set forth facts justifying an award. Under the ADA, punitive damages are available if the defendant has "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Under Oregon law, an award of punitive damages requires "clear and convincing evidence" that a defendant "acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." O.R.S. 31.730.

Defendants argue that because Plaintiff fails to present facts indicating that KOIN was consciously taking Plaintiff's disabilities into account at the time of his termination, he is not entitled to punitive damages. The preceding discussion of Plaintiff's disability claims disposes of Defendants' argument. When the facts are construed in Plaintiff's favor, there is evidence from which a jury could determine that Defendants were at least recklessly indifferent to Plaintiff's rights. Under either federal or state law, the punitive damages request survives summary judgment.

VI. Nexstar's Successor Liability

Defendants move for summary judgment on the issue of Nexstar's liability. Plaintiff cross-moves for summary judgment on the same issue. It is undisputed that Nexstar was not Plaintiff's employer at the time of the events occurring in this case in 2015. It did not take the actions at issue in this lawsuit. There is no dispute that on February 26, 2016, Plaintiff filed an administrative complaint with the Oregon Bureau of Labor and Industries (BOLI) and in that complaint, raised the federal and state statutory claims he brings here. Mechanic May 29, 2018 Supp'l Decl., Ex. 1, ECF 48-1. There is no dispute that he named LIN-TV, dba KOIN-TV, as the

respondent in that administrative complaint. *Id.* There is no dispute that Plaintiff received a right to sue letter from BOLI on December 29, 2016[4] and from the Equal Employment Opportunity Commission (EEOC) on March 24, 2017. *See* Compl. ¶ 29, ECF 1; Answer ¶ 29, ECF 29 (admitting that BOLI/EEOC complaints filed and right to sue letters received but denying that a complaint was filed against Nexstar or a right to sue letter issued as to Nexstar).

In support of their motion, Defendants argue that (1) Nexstar cannot be a defendant because it was not Plaintiff's employer and it did not take any of the actions at issue in this lawsuit; (2) Nexstar cannot be a defendant because Plaintiff failed to name Nexstar in an administrative complaint; (3) any claim that Plaintiff has against Nexstar under Oregon law is time barred; and (4) Plaintiff has not asserted sufficient facts to establish successor liability and such liability is premature in any event because no liability against LIN-TV has been established in the first place.

A.  Administrative Exhaustion - Failure to Name Nexstar in Agency Complaint

In order to proceed on an ADA claim, a plaintiff must comply with the procedural requirements of Title VII. *See* § 12117 (adopting the Title VII remedial procedures set forth in 42 U.S.C § 2000e–5). The Ninth Circuit interprets § 2000e–5 to require a plaintiff to exhaust administrative remedies before filing suit. *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 644 (9th Cir. 2003); *see also Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000) ("[T]he ADA adopts the procedural requirements of Title VII, including the EEOC filing requirement . . . "),

---

[4]  The Complaint contains an obvious typographical date error by alleging that BOLI issued its right to sue notice on December 29, 2017. Compl. ¶ 29. Because this lawsuit was filed in March 2017, Plaintiff must have meant to allege that the notice was issued on December 29, 2016.

*overruled on other grounds*, *Socop–Gonzalez v. I.N.S.*, 272 F.3d 1176 (9th Cir. 2001).

Defendants contend that Plaintiff's failure to name Nexstar in the BOLI complaint precludes

Plaintiff from maintaining any claims against Nexstar.[5]

Ninth Circuit cases indicate that Defendants are incorrect. In *Slack v. Havens*, a 1975

Ninth Circuit case, the court expressly followed a Sixth Circuit case in holding that a Title VII

claim may be brought in court against a defendant not named in an EEOC complaint where that

defendant is a successor to the named party in the EEOC filing. 522 F.2d 1091, 1094-95 (9th

Cir. 1975). In *Slack*, the plaintiffs had named their employer Glenn C. Havens in the

administrative charge. Havens International was incorporated after the employees' discharge and

was not named in the administrative charge but was named in the civil suit. On appeal after a

judgment in the plaintiffs' favor, Havens International argued that it could not be jointly liable for

the judgment.

The Ninth Circuit rejected the argument. It explained:

We agree with the analysis of the successor corporation problem stated by the
Sixth Circuit in *EEOC v. MacMillan Bloedel Containers, Inc.* (6th Cir. 1974) 503
F.2d 1086. When a successor corporation has not been named in antecedent
charges filed with the EEOC, its liability to suit depends on "1) whether the
successor company had notice of the charge, 2) the ability of the predecessor to
provide relief, 3) whether there has been a substantial continuity of business
operations, 4) whether the new employer uses the same plant, 5) whether he uses
the same or substantially the same work force, 6) whether he uses the same or
substantially the same supervisory personnel, 7) whether the same jobs exist under
substantially the same working conditions, 8) whether he uses the same
machinery, equipment and methods of production and 9) whether he produces the
same product." (*Id.* at 1094.)

---

[5] Of the federal and state statutory claims at issue in this case, only the federal ADA
claim requires administrative exhaustion as a prerequisite to filing suit. Thus, this particular
argument by Defendants does not implicate the state claims.

*Id.* at 1094. The *Slack* court found that Havens International met "substantially all of these 'sameness' inquiries." *Id.* at 1095. The court explained that while Havens International sought to avoid liability because it did not have notice of the EEOC proceeding, the "absence of technical notice of the EEOC proceedings before suit was filed does not prevent liability." *Id.* Instead, "International had a full and fair opportunity to present all of its defenses to the district court, and it was not prejudiced in any way by a failure to give antecedent notice of the EEOC proceedings in which, at that time, it was disinterested." *Id.*

*MacMillan*, the case *Slack* relied on, contains a more thorough discussion of the issue. Given the Ninth Circuit's express recognition and adoption of *MacMillan*, that discussion is relevant. The plaintiff in *MacMillan* filed an EEOC charge against her employer Flintkote Company. 503 F.2d at 1088. The allegations were directed at Flintkote's Cleveland, Ohio facility. *Id.* The court noted that at "some time, not apparent from the records, MacMillan took over operation" of Flintkote's Cleveland facility but that the "nature of the transaction between Flintkote and MacMillan does not appear in the record." *Id.*

In the district court, MacMillan moved to dismiss because it was not named in the EEOC complaint. The EEOC argued that MacMillan was nevertheless liable as a successor employer to remedy the discriminatory practices of Flintkote. *Id.* at 1089. The EEOC relied on law which had been developed under the National Labor Relations Act (NLRA) for liability by successor employers for unfair labor practices committed by their predecessor employers. *Id.* After considering the relevant cases, the *MacMillan* court held that the considerations in the NLRA cases were equally applicable to remedy Title VII violations. *Id.* at 1090. Indeed, the court held, Title VII "mandates" the "application of the successor doctrine." *Id.* at 1091. The court went on

to note the remedial nature of Title VII and its intention to eradicate discrimination in

employment, explaining that

> [f]ailure to hold a successor employer liable for the discriminatory
> practices of its predecessor could emasculate the relief provisions of Title VII by
> leaving the discriminatee without a remedy or with an incomplete remedy. In the
> case where the predecessor company no longer had any assets, monetary relief
> would be precluded. Such a result could encourage evasion in the guise of
> corporate transfers of ownership. Similarly, where relief involved seniority,
> reinstatement or hiring, only a successor could provide it.
>
> It is to be emphasized that the equities of the matter favor successor
> liability because it is the successor who has benefitted from the discriminatory
> employment practices of its predecessor.

*Id.* at 1091-92.

The *MacMillan* court also examined the language of § 2000e-5 regarding the filing of the

EEOC charge and noted the following: "If the charging requirement is read in light of the statute

of limitations, it is reasonable to assume, at least in the case of successor companies, that

Congress only intended that a discriminatee be required to name those who were known to him

and could have been charged within the period of limitations." *Id.* at 1093 (noting that this

"interpretation is logical and wholly consistent with the purposes of Title VII"). Moreover, the

court continued, the concept of informal settlement and conciliation, which is the purpose of the

administrative exhaustion requirement, would not be served by requiring an aggrieved person to

file a new charge for each new successor company. *Id.* It could even encourage "evasion

through corporate transfers." *Id.* And as to bona fide transfers of ownership, delays could be

substantial, discriminatees could be prejudiced, and "serious questions would be presented as to

whether a charge filed against a successor would be barred by the statute of limitations." *Id.*

Finally, the *MacMillan* court noted the "multiplicity of factors" that other courts had

considered in analyzing the successorship question in the labor context. *Id.* at 1094. Those are the factors quoted in *Slack*. The court found that MacMillan's own affidavit presented in support of its motion to dismiss created issues of fact on the issue of successor liability. That affidavit showed that MacMillan operated its facility at the same address as Flintkote. *Id.* It had notice of the EEOC proceedings and custody and control of all charges and documents which had been filed against Flintkote for its Cleveland facility. *Id.* And, because MacMillan and Flintkote were both manufacturers of containers, and Flintkote manufactured containers at its Cleveland facility, a genuine question arose as to whether MacMillan continued Flintkote 's container operation. Thus, the Sixth Circuit concluded that the district court erred in dismissing MacMillan. *Id.*

In *Sosa v. Hiraoka*, 920 F.2d 1451 (9th Cir. 1990), the district court dismissed certain individual defendants in a Title VII case because the plaintiff had not named them in his EEOC complaint. The Ninth Circuit reversed. Although the case did not address successor liability, it affirmed the concept that there are exceptions to the "general rule" that defendants must be named in the administrative charge in order to be named in the civil case. *Id.* at 1458-59. The *Sosa* court identified three such exceptions: (1) if the respondent named in the EEOC charge is a principal or agent of the unnamed party or if the respondent named in the EEOC charge and the unnamed party are "substantially identical parties"; (2) if the EEOC could have inferred that the unnamed party violated Title VII; and (3) if the unnamed party had notice of the EEOC conciliation effort and participated in the EEOC proceedings. *Id.* at 1459.

Finally, another Ninth Circuit case requires mentioning. In *Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093 (9th Cir. 1989), the plaintiffs prevailed in an age discrimination suit and obtained a permanent injunction against their then-employer Western Air Lines. That injunction

was issued in May 1981.  Several years later, Western was acquired by Delta.  The merger was

completed in 1987.  After the merger, Delta began enforcing the same discriminatory policy that

had been the subject of the claims against Western.  The plaintiffs returned to district court and

moved to have Western and Delta held in contempt for violating the final judgment and

injunction.  The district court granted the motion and held that Delta was a successor to Western.

Delta appealed.  The Ninth Circuit affirmed.

The court began its discussion by explaining that "[i]n an employment discrimination

action, there are three principal factors relating to successor liability:  (1) continuity in operations

and work force of the successor and predecessor employers; (2) notice to the successor employer

of its predecessor's legal obligation; and (3) ability of the predecessor to provide adequate relief

directly."  *Id.* at 1094.  The court found all elements were satisfied.  There was continuity in

operations and the work force of the successor and predecessor employers.  *Id.* at 1095.  Delta

was on notice of Western's legal obligations because it had filed an amicus brief in the action

against Western.  And Western was incapable of providing the relief required by the injunction

because it no longer existed as a corporate entity.  *Id.*[6]

---

[6]  As a 1994 American Law Reports Annotation indicates, several other circuits have reached the same conclusion regarding successor liability and the ability to proceed with civil claims in court against a successor defendant who was not named in an administrative charge. Betsy Williams, "*When May Person Not Named as Respondent in Charge Filed with [EEOC] Under Title VII of Civil Rights Act of 1964*," 121 A.L.R. Fed. 1 (1994) at § 2[a] (noting in background and summary section that courts in several cases have permitted Title VII plaintiffs to maintain an action against a party which was the successor to an employer named in a charge filed with EEOC, even though the successor had not been named in the charge before the EEOC, based on such circumstances as the successor's notice of the charge and opportunity to respond to it, or the substantial continuity between the operations of the successor and the predecessor);*see also id.* § 45[a] (collecting cases from several circuits in which a plaintiff was permitted to maintain an action when successor was not named in EEOC filing).

Defendants primarily rely on cases which reject a plaintiff's attempts to add new *claims* in a civil case when those claims were not raised in the administrative charge. These cases do not address the omission of a party from the administrative complaint or successor liability. *Agosta v. Suffolk Cty*, 981 F. Supp. 2d 167, 171 (E.D.N.Y. 2013) (court had no jurisdiction over disability discrimination claim which had not been raised in the EEOC complaint and was not "reasonably related" to the sex and sexual orientation discrimination claims that had been raised there); *Brown v. Haw. Dep't of Public Safety,* No. 08-00470 JMS/LEK, 2009 WL 2744013, at **5-7 (D. Haw. Aug. 28, 2009) (granting summary judgment to defendant on all claims except particular discrimination claims actually raised in the administrative complaint), *aff'd*, 446 F. App'x 70 (9th Cir. 2011). While these cases address the importance of administrative exhaustion, they are not on point to the issue here.

Defendants also rely on *EEOC v. Labor Solutions of Alabama, LLC*, 242 F. Supp. 3d 1267 (N.D. Ala. 2017), where the court dismissed a claim against a successor to the named employer. On behalf of several employees, the EEOC brought Title VII and ADA claims against the purported successor to the employees' former employer. The named Defendant, LSA, had not been named in the EEOC charge. *Id.* at 1283. On a motion to dismiss, the district court held that the EEOC had not alleged sufficient facts to show that LSA was a successor in interest to the former employer or to show that the plaintiffs should be allowed to proceed against LSA when it was not named in the administrative charge. *Id.* at 1281, 84. Importantly, the court recognized that successor liability principles apply to ADA claims such that a successor may be liable for the alleged ADA violations of its predecessor, *id.* at 1272-80, and that a party not named in an EEOC charge may still be sued in a later civil action under certain circumstances. *Id.* at 1283. But, the

court explained, the EEOC had not sufficiently pleaded facts to support successor liability. *Id.* at 1282 (the complaint lacked facts suggesting substantial continuity in business operations, sale of assets, and more); *id.* at 1283 (complaint lacked facts supporting exceptions to exhaustion requirement). Notably, the court allowed the EEOC to amend the complaint to state sufficient facts.

*Labor Solutions of Alabama* does not help Defendants because that court recognized the principles of successor liability and held only that the EEOC had failed to plead sufficient facts to withstand the motion to dismiss. It granted leave to amend. Defendants here did not move to dismiss the allegations in the Complaint that in 2017, Nexstar acquired LIN-TV. *Labor Solutions* is entirely distinguishable.

In the instant case, it is undisputed that Nexstar operates KOIN under the same broadcast license held by LIN-TV. Mechanic Apr. 23, 2018 Decl., Ex. 24 (FCC Order). Wenger confirmed in deposition that KOIN's organizational structure has not changed from 2012 to present and that KOIN staffing was essentially the same before and after the merger. Mechanic May 29, 2018 Supp'l Decl., Ex. 3, ECF 48-3. It is clear from the record that several personnel who were employed by LIN-TV/Media General are employed by Nexstar at KOIN, including Plaintiff and Wenger. It is also clear from the record that the operations performed by KOIN have not changed with the merger of Medial General and Nexstar. Defendants point to the fact that LIN-TV and Nexstar have no board of director members or "key executive officers" in common. Wenger May 14, 2018 Decl. ¶ 4, ECF 40. They are different-sized companies. *Id.* (Nexstar owns and operates 170 broadcasting stations around the control while LIN-TV, as a subsidiary of Media General, operated only about 40). LIN-TV had headquarters in Providence,

Rhode Island and Nexstar is headquartered in Texas. *Id.* Media General was located in Virginia before it dissolved as a result of the merger with Nexstar. *Id.*

Plaintiff argues that under *Slack*, Nexstar had notice of LIN-TV's legal obligation because it had notice of this lawsuit and has had an opportunity to present all of its defenses. *See Slack*, 522 F.2d at 1095 (suggesting that Havens International was liable even though it was not named in the EEOC complaint when it "had a full and fair opportunity to present all of its defenses to the district court, and it was not prejudiced in any way by a failure to give antecedent notice of the EEOC proceedings in which, at that time, it was disinterested." ). Plaintiff states that after obtaining the BOLI right to sue notice, Plaintiff's counsel communicated with the person who had represented LIN-TV/Media General during the arbitration proceeding, to propose a settlement of Plaintiff's ADA and OFLA claims. Mechanic May 29, 2018 Supp'l Decl. ¶ 3. Plaintiff's counsel learned then that Media General no longer owned LIN-TV. *Id.* He was told that his letter would be forwarded to the new owner, Nexstar. *Id.* Nexstar's in-house counsel emailed Plaintiff's counsel to inform him that Nexstar would be hiring outside counsel. *Id.* ¶ 4. Then, shortly thereafter, Defendants' current counsel contacted Plaintiff counsel to tell him he had been retained to represents KOIN's interests. *Id.* Subsequent communication between counsel did not resolve the dispute and thus, Plaintiff filed this action. *Id*

Plaintiff also points out that Wenger, KOIN's business manager and human resources director, participated in the alleged discriminatory acts while he was employed by LIN-TV and then he continued in that role under Nexstar. In a 2013 case, the District of Arizona cited *Criswell*, 868 F.3d at 1094, for the proper analysis in determining successor liability in employment discrimination claims, and held that the notice factor was met because the

management employees who participated in the alleged harassment under the prior company continued as management of the successor company. *EEOC v. AN Luxury Imports of Tucson, Inc.*, No. CV 11-617-TUC-FRZ, 2013 WL 12044519, at *4 (D. Ariz. Dec. 5, 2013). I agree with Plaintiff that although the EEOC/BOLI administrative process was already complete, Nexstar had notice of the claims before suit was actually filed. And, Nexstar had further notice once the Complaint in this case was filed and has had the opportunity to present its legal defenses.

Finally, Plaintiff argues that only Nexstar can provide relief because LIN-TV no longer exists. Defendants do not dispute this assertion.

The law is clear that Plaintiff's failure to name Nexstar in his BOLI complaint does not preclude naming Nexstar in this action. The relevant facts are undisputed. These undisputed facts show that Nexstar is jointly liable as a successor to LIN-TV. The Ninth Circuit cases focus on the continuity of operations and personnel as well as notice and the ability of the predecessor to provide relief. The factors used in the Ninth Circuit discussion of the issue emphasize substantially similar operations at what could be called "the production level," not whether there are overlapping boards of directors or key executives. *E.g.*, *Slack*, 522 F.2d at 1094-95 (focusing on whether the employer uses the same plant, same work force, same supervisors, same machinery and equipment, and uses the same jobs with similar working conditions to produce the same product); *Criswell*, 886 F.2d at 1094 (looking at continuity in operations and work force). Here, KOIN produces the same product post-merger as it did pre-merger, uses some of the same personnel, is still located in Portland, and continues with similar staffing. Nexstar had notice of the claims and there is no relief available from LIN-TV. Additionally, Nexstar has assumed the liabilities and claims of Nexstar. The "origins of successor liability are equitable," and therefore,

"fairness is a prime consideration in its application." *Id.* Under this standard, the facts show that Nexstar is liable on the ADA claims as a successor.

### B. Plaintiff's Oregon Claims

Defendant argues that Plaintiff's OFLA claim is untimely. Under the applicable statute, Plaintiff has one year after the alleged unlawful employment practice to file a civil action under O.R.S. 659A.885, *unless* the person has filed a BOLI complaint. O.R.S. 659A.875(1). The same is true for Plaintiff's disability discrimination and failure to accommodate claims brought under Oregon statute. *Id.* If a BOLI complaint has been filed, the civil claims are timely if filed within ninety days after a ninety-day right to sue notice is mailed. O.R.S. 659A.875(2). There is no dispute that Plaintiff timely filed this action on March 27, 2017.

Defendants' motion against the Oregon claims assumes that Plaintiff's failure to name Nexstar in his BOLI complaint means that Plaintiff had to file his OFLA claim against Nexstar within one year of the unlawful employment practice. Given that Oregon statutory employment claims are to be construed and treated like their federal counterparts, the analysis of successor liability developed under federal employment discrimination claims should apply equally to the OFLA claim and the Oregon statutory disability claims. Alternatively, even if Oregon common law applies, Nexstar is liable as a successor under those principles as well.

In a 2004 case, Judge Coffin considered the issue of successor liability in the context of claims for breach of contract, account stated, and quantum meruit. *Giant Mfg. Co. v. Bikee Corp.*, No. Civ. 02-6222-TC, 2004 WL 1698056, at *1 (D. Or. July 28, 2004). There, he explained that Oregon courts follow the "traditional rule regarding successor liability" as stated in *Erickson v. Grand Ronde Lumber Co.*, 162 Or. 556, 568, 92 P.2d 170 (1939)). *Id.* at *5.

Quoting from *Erickson*, Judge Coffin wrote:

> "The general rule is that where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor.... To this general rule there are four recognized exceptions, under which the purchasing corporation becomes liable for the debts and liabilities of the selling corporation. (1) Where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporations; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts."

*Id.* (quoting *Erickson*, 162 Or. at 568). Here, given the Merger Agreement's assumption of outstanding liabilities and claims, the "purchaser" expressly agreed to "assume such debts." Additionally, the facts discussed above show that as to KOIN, Nexstar, as the purchasing corporation, is a continuation of the selling corporation. Thus, under either federal or state law principles of successor liability, Nexstar is jointly liable as a successor to LIN-TV for the Oregon statutory claims. With that, Plaintiff's failure to bring suit within one year is not fatal because Plaintiff's administrative charge against LIN-TV, the predecessor entity, was timely filed.

### C. Successor Liability - Timely to Raise or Premature

Defendants argue that Plaintiff's motion on the issue of Nexstar's liability is premature because as presented, Plaintiff seeks a successor liability determination in the abstract and without reference to what law the liability was incurred under. Defs.' Resp. to Pl's Mot. 13-14. I reject this argument because Defendants offer no law to support their position that the successor liability issue is premature and the facts support a determination as a matter of law that Nexstar is jointly liable as a successor on Plaintiff's claims.

### CONCLUSION

Defendants' motion for summary judgment [34] is granted in part and denied in part as

follows:  (1) granted as to Plaintiff's IIED claim; (2) granted as to Plaintiff's retaliation claims; (3) granted as to the interactive process claims as stand-alone claims; and (4) denied as to all other claims.  Plaintiff's motion for partial summary judgment [35] is granted.

IT IS SO ORDERED.

Dated this _____ day of  July, 2018.


Marco A. Hernandez
United States District Judge